IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| EASY CORNER, INC., | : | CIVIL ACTION |
| --- | --- | --- |
| | : | NO. 14-1053 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| STATE NATIONAL INSURANCE | : | |
| CO., INC., | : | |
| | : | |
| Defendant. | : | |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                                        January 6, 2016

This case arises from an insurance dispute. Easy Corner, Inc. ("Plaintiff") alleges that State National Insurance Company ("Defendant") has breached contract by declining to pay Plaintiff for damage suffered after a business dispute with a third party. Following a bench trial and pursuant to Federal Rule of Civil Procedure 52(a), this Memorandum constitutes the Court's findings of fact and conclusions of law. Ultimately, for the following reasons, the Court will enter judgment for Defendant.

I.  PROCEDURAL BACKGROUND

On January 28, 2014, Plaintiff filed a Complaint in the Court of Common Pleas for Philadelphia County (ECF No. 1 Exhibit A). The Complaint contained two counts: breach of contract for failing to pay on the insurance policy, and bad faith in violation of 42 Pa. C.S.A. § 8371. Defendant removed the case to this Court (ECF No. 1), then filed an Answer on February 27, 2014 (ECF No. 3).

After completing discovery, Defendant filed a motion for summary judgment (ECF No. 14). Plaintiff responded to the motion on September 5, 2015 (ECF No. 15), and Defendant replied to Plaintiff's response on September 12, 2014 (ECF No. 17).

On November 3, 2014, the Court granted the motion for summary judgment in part and denied it in part (ECF Nos. 20, 21). Finding insufficient evidence of bad faith, the Court granted Defendant summary judgment as to Plaintiff's claim of bad faith. On the breach of contract claim, the Court granted summary judgment as to any claims of loss from theft, but denied summary judgment as to the balance of Plaintiff's claim.

The Court then held a bench trial on February 9, 2015. Plaintiff called as witnesses Sara Reuven and Ezra Reuven, as well as three insurance adjusters: Timothy Brennan,[1] Steven

---

[1] The Court also heard argument on Defendant's motion to exclude Brennan's testimony (ECF No. 22) as to damages.

Fasano, and Brian DiBricida. Defendant called Darius Mason as a witness. The Court has reviewed this testimony and the parties' proposed findings of fact and conclusions of law (ECF Nos. 35, 36), as well as the exhibits admitted at trial. The Court also held an additional hearing on December 7, 2015, and has considered the arguments made there, as well as the parties' supplemental memorandums (ECF Nos. 40, 42). Upon this record, including credibility findings, the Court makes its findings of fact and conclusions of law.

## II. FINDINGS OF FACT

For more than ten years, Ezra and Sara Reuven owned and operated Easy Corner Bar at 537 North 35th Street in Philadelphia. Trial Tr. at 28:1-19, ECF No. 33. In 2012, the couple decided to get a new manager for the bar (Sara had managed it previously), and ultimately entered into a management agreement with Darius Mason. Id. at 28:14-29:4. Under the terms of the agreement, Mason would manage the bar from June 2012 through May 2013. Id. at 29:3-7. However, Mason continued to

---

Ultimately, the Court conditionally admitted Brennan's testimony, electing to hear the testimony before deciding whether it was admissible. Trial Tr. at 24:4-25:7, ECF No. 33.

For the reasons discussed below, the Court finds that Plaintiff is entitled to no damages. Accordingly, the Court need not decide the Motion to Exclude Expert Testimony – because Brennan offered testimony relating only to damages – and so the motion will be denied as moot.

operate the bar after the end of the agreement. In fact, at one point, the Reuvens changed the locks, but he cut them and put his own locks on. Id. at 29:9-19. Eventually, however, Mason and the Reuvens agreed that Mason would surrender operation of the bar on August 18, 2013. Id. at 252:13-253:6.

During Mason's tenure at the bar, with the knowledge of the Reuvens, he made a number of changes and improvements to it. For example, he installed speakers, mirrored ceiling tiles, a slushie machine, a DJ booth, a video game machine, new floor tiles, shelves, lights, a television, bar paneling, an air conditioning unit, and more. Id. at 236:13-252:7. Mason paid for all of these alterations and additions himself. Id. at 252:8-12.

When it was time for Mason to vacate the bar on August 18, he decided to take with him the things that he had added to the property, because he intended to reuse them. Id. at 253:2-15. He informed Ezra that he was going to remove his things, but would clean up and repair the bar afterward. Id. at 257:5-11. With the help of several friends, Mason began to uninstall and take away his items. Id. at 253:7-255:7. But after he had taken away two truckloads – and while he was still in the process of removing items – the Reuvens arrived at the bar and called the police. Id. at 255:2-18, 272:3-5. Mason assured Ezra that he was going to repair the areas that had been left in disarray as a result of his removing his things – and, in fact, he had tools,

plywood, ceiling tiles, and drywall ready so he could do just that – but the police arrested Mason before he could repair or restore the place to its previous condition. Id. at 272:6-22, 257:2-258:8. Mason and his friends were taken to the police station, where they were held briefly, but they were not charged with any crimes, and Mason ultimately got back his truck and the contents of it. Id. at 274:1-275:6.

**III. CONCLUSIONS OF LAW**

Plaintiff claims that under its insurance policy, Defendant is liable for any repairs needed after Mason removed his items from the bar.[2]

In Pennsylvania, the insured has the burden "to establish coverage under an insurance policy." Nationwide Mut. Ins. Co. v. Cosenza, 258 F.3d 197, 206 (3d Cir. 2001). If the insured does so, the burden shifts to the insurer to establish an applicable exclusion to coverage. Id. Exclusions are "strictly construed against the insurer and in favor of the insured." Id. at 206-07.

---

[2] Plaintiff does not appear to dispute that Mason had a right to remove the items he took from the bar. See Trial Tr. 71:16-18. Any potential loss that Plaintiff incurred here, therefore, is limited to any damage Mason may have done in the process of removing these items.

Under the all-risk insurance policy in this case, coverage extends to "direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss." Def.'s Mot. Summ. J. Ex. C at 1 of 16, ECF No. 14-4. Any cause of loss appears to be covered "unless the loss is excluded or limited in this policy." Id. at 1 of 10. In other words, all losses are covered unless specifically excluded, so Plaintiff need only show that a loss occurred to meet its burden. Here, it is obvious that Mason's actions caused loss or damage in the sense that portions of the bar needed repair after Mason removed his things. Therefore, Plaintiff has established coverage, and the Court must now consider whether Defendant has shown that an exclusion applies.

Defendant argues that under the circumstances here, an "unnamed exclusion" not expressly included in the policy applies: the fortuity exclusion.[3] The Third Circuit has

---

[3] In turn, Plaintiff argues that Defendant should be estopped from raising the issue of fortuity because Defendant initially denied coverage not on the basis that the loss was not fortuitous, but on the basis that the insurance policy, due to another exclusion, did not cover acts of destruction by employees or theft by employees. Under the "mend the hold" doctrine, Plaintiff says, Defendant cannot now change the basis for denial. See Ry. Co. v. McCarthy, 96 U.S. 258, 267-68 (1877) ("Where a party gives a reason for his conduct and decision touching any thing involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold.").

6

predicted[4] that the Pennsylvania Supreme Court would recognize this implicit exclusion in every all-risk insurance policy, like the one in this case.[5] This Court will assume the same. See, e.g., Koppers Co., Inc. v. Aetna Cas. & Sur. Co., 98 F.3d 1440,

---

However, because Plaintiff is asserting an estoppel argument, Plaintiff must demonstrate prejudice that resulted from Defendant's change of position. Mendel v. Home Ins. Co., 806 F. Supp. 1206, 1215 (E.D. Pa. 1992) ("[I]n the context of an insurer's failure to assert all possible defenses to coverage, the courts apply an estoppel only when there is actual prejudice, that is, when the failure to assert all possible defenses causes the insured to act to his detriment in reliance thereon."); see also Rock-Epstein v. Allstate Ins. Co., No. 07-2917, 2008 WL 4425059, at *3-4 (E.D. Pa. Sept. 29, 2008). Plaintiff has not even attempted to show prejudice, and it is unlikely that Plaintiff could do so successfully, because (1) Defendant's current position that the fortuity exclusion applies is not inconsistent with its previous position; and (2) in its initial denial letter as well as its Answer to the Complaint, Defendant reserved the right to assert other defenses. See Compl. Ex. C, ECF No. 1-1; Answer 4, ECF No. 3. Moreover, Plaintiff has also changed positions, or asserted new alternative positions, several times throughout this litigation. Under those circumstances, Plaintiff could not reasonably argue that by responding with its own new alternative position, Defendant unfairly surprised and prejudiced Plaintiff. Accordingly, the "mend the hold" doctrine is inapplicable here.

[4] "When exercising diversity jurisdiction, a federal court sitting in Pennsylvania must predict how the Supreme Court of Pennsylvania would decide questions of state law." Fry v. Phoenix Ins. Co., 54 F. Supp. 3d 354, 361 (E.D. Pa. 2014) (citing Specialty Surfaces Int'l, Inc. v. Cont'l Cas. Co., 609 F.3d 223, 237 (3d Cir. 2010)).

[5] Although the insurance policy does not label itself an "all-risk" policy, it is one, as it provides coverage for all loss or damage unless specifically excluded by the terms of the policy. See Bishops, Inc. v. Penn Nat. Ins., 984 A.2d 982, 994-95 (Pa. Super. Ct. 2009). The parties also indicated that they agree with this assessment at the December 7, 2015, hearing on the issue of fortuity.

7

1446-47 (3d Cir. 1996); Intermetal Mexicana, S.A. v. Ins. Co. of N. Am., 866 F.2d 71, 74-75 (3d Cir. 1989).

The "fortuity exclusion," as it has sometimes been labeled, should perhaps be called the nonfortuity exclusion, because it precludes coverage under all-risk policies for losses arising from nonfortuitous events, even if a loss would be otherwise covered under the insurance policy. See id. An event is fortuitous if, "so far as the parties to the contract are aware, [it] is dependent on chance." Compagnie des Bauxites de Guinee v. Ins. Co. of N. Am., 724 F.2d 369, 372 (3d Cir. 1983) (quoting Restatement of Contracts § 291 cmt. a (1932)). Such an event "may be beyond the power of any human being to bring the event to pass; it may be within the control of third persons; it may even be a past event . . . provided that the fact is unknown to the parties." Id. If the event is "expected or intended," it is not fortuitous. Koppers Co., 98 F.3d at 1446.

Morrisville Pharmacy, Inc. v. Hartford Casualty Insurance Co., No. 09-2868, 2010 WL 4323202 (E.D. Pa. Oct. 29, 2010), which involved a dispute over physical access to a pharmacy, is factually analogous to the case at hand. In Morrisville, the owner of the pharmacy at issue – the tenant – suffered an overdose on the premises and was hospitalized for nearly two months. During that time, the pharmacy was closed. More than a month after the pharmacy was first closed, the

8

property owner – the landlord – sent a letter to the tenant, asking her to surrender the premises because the pharmacy was no longer open for business. Nearly two weeks later, after the tenant failed to respond, the landlord changed the locks and secured the doors with a chain. When the tenant found that she could not enter her pharmacy, she reported the lock change to the police, who "characterized the matter as a civil dispute and noted no loss of Pharmacy property." Id. at *1. Eventually, the tenant filed an insurance claim, alleging that the pharmacy suffered losses due to her inability to access files and other property within the building. The district court granted summary judgment for the insurance company, holding that no covered loss occurred – and that even if a loss had occurred, the event that caused it was not fortuitous. Specifically, the court said, any loss arose from a business dispute, the results of which the tenant could have foreseen because of the landlord's letter.

Similarly, though Mason's actions in the underlying events of this case have been characterized as "theft" and "vandalism" at various points during this litigation, it is now clear that the losses Plaintiff suffered arose from a business dispute that was not "outside the parties' realm of control." Intermetal Mexicana, 866 F.2d at 77.[6]

---

[6] To be clear, the Court is not stating that losses arising from a business dispute can never be fortuitous. In this

9

The events at issue here began not on August 18, 2013, but earlier in Mason's tenure as manager of the bar, when, to the knowledge of the Reuvens, he began to make fairly extensive alterations to the property. Mason installed quite a few items in the bar, some of which involved altering the very structure

---

case, for example, if in response to an ongoing dispute with the Reuvens, Mason entered the bar and simply trashed the place, those losses may well be fortuitous. Or if what Mason took was not in fact his to take, but rather the property of the bar, the losses would likely then be fortuitous. See A & B Enters. v. Hartford Ins. Co., 604 N.Y.S. 2d 166, 389-90 (N.Y. App. Div. 1993) (finding fortuitous a loss where a third party, under no claim of right, took some of the insured's property after a dispute over wages owed to the third party). The relevant question, it seems, should be not whether the losses arose from a dispute of some kind, but the amount of control the insured had over the act that caused the loss. The fact that the loss arises from a dispute between the insured and a third party may therefore be relevant, but not dispositive, as is the case here.

However, this distinction may be merely semantic, as it is possible that the matter of "control" is built into the definition of a business dispute – that is, that all business disputes are necessarily within the control of the insured. Intermetal Mexicana arguably suggested as much in a footnote, quoting a representative of the insurance company: "A business dispute in particular is something that is typically within the control of the insured." 866 F.2d 77 n.14. However, the Intermetal Mexicana court expressed no opinion about whether that statement is true as a matter of law. If it is, then the question is indeed whether the insured had control over the events at issue.

At any rate, some courts outside of this circuit have made "control" an explicit consideration. New York, for example, defines a "fortuitous event" to mean "any occurrence or failure to occur which is, or is assumed by the parties to be, to a substantial extent beyond the control of either party." Highland Capital Mgmt., L.P. v. Glob. Aerospace Underwriting Managers Ltd., 488 F. App'x 473, 475 (2d Cir. 2012) (quoting New York Insurance Law § 1101(a)(2)).

of the bar. See Trial Tr. at 235:23-252:12. For example, in a space that had been empty, Mason built a wall with a door and a window for a DJ booth. Id. at 237:22-238:21. He also built shelves, id. at 240:23-241:2, 243:18-244:4, several additional and replacement walls, id. at 243:1-10, 245:2-5, and installed new lighting behind the bar, id. at 244: 5-20, and new wood on the top and sides of the bar itself, id. at 248:21-249:8, among other changes. Mason made all of these alterations at his own expense. Id. at 252:8-12.

The heart of this matter is ultimately a dispute about Mason's right to reverse these changes he made to the bar – which necessarily involved deconstructing portions of the space, such as the wall he built for the DJ booth. Apparently, the Reuvens had no problem with Mason making improvements to the bar on his own dime, so long as he left them in place when he left the bar.[7] On the other hand, Mason believed it to be fully his right to remove all items he had added to the property, regardless of whether they had become part of the structure of the bar. As a result, it appears that when Mason and Ezra formed "an understanding that [Mason] was going to take [his] stuff

---

[7] Ezra testified: "If they want to take your stuff professionally, I understand. If it's your stuff, you are allowed to take. But first of all, I understand everything you bolt to the wall, everything you build you not allowed to take it apart." Trial Tr. 71:14-20. Whether this testimony accurately states the law is not an issue before the Court at this time.

11

back, but . . . clean up the bar and put things back in good nature," id. at 257:6-10, they were on different pages regarding the type of "stuff" Mason would be taking.

In effect, the Reuvens seek compensation from the insurance company because Mason did not leave his alterations in place – or, at the very least, because he did not remove them "professionally," as Ezra testified.[8] Id. at 71:17. This loss is not fortuitous, because the course of events was not outside the Reuvens' "realm of control." Intermetal Mexicana, 866 F.2d at 77. They allowed Mason to make alterations at his own expense for some time.[9] Then Ezra formed the aforementioned understanding about Mason removing his things before leaving the bar. Whether

---

[8] Plaintiff does also argue that Mason's behavior on August 18 was "intentional defacement" of the bar, going beyond Mason's removal of his own items, but the evidence put forth at trial does not support that conclusion. Plaintiff offers "cutting wires" and "ripping down walls" as examples of such defacement. Pl.'s Supp. Mem. Law 3, ECF No. 40. But Mason cut only the wires supporting lights he himself had installed, Trial Tr. at 259:11-260:7, and the walls he took down were also walls that he himself had installed, id. at 263:13-265:8.

[9] For this reason, Plaintiff's argument that "Plaintiff's [sic] had no way of knowing this could happen," Pl.'s Supp. Mem. Law 3 – "this" being Mason's so-called destruction of the bar – is clearly incorrect. It is unfortunate for the Reuvens if they misunderstood Mason's intentions in improving the bar on his own dime, but the results are far from unforeseeable. Indeed, it should have been entirely foreseeable that Mason's many additions to the bar were perhaps not done out of the kindness of his own heart, for the benefit of the bar even after his own tenure there, and that upon his departure, he might want to take with him the items he installed at his own expense.

12

Mason and Ezra had the same understanding about what exactly Mason would be taking – or about whether Mason even had the right to remove items he had installed in the bar – is a contractual matter between the two of them. Ezra's obvious misunderstanding about Mason's stated plans does not render the resulting loss fortuitous, especially where the Reuvens actively prevented Mason from "put[ting] things back in good nature," Trial Tr. 257:9-10, by having him arrested.

In short, nothing about this scenario was "dependent on chance." Compagnie des Bauxites de Guinee, 724 F.2d at 372. Rather, it resulted from apparent miscommunication between Mason and the Reuvens, which the Reuvens had ample opportunity to correct or clarify throughout Mason's tenure at the bar. Accordingly, the loss claimed by Plaintiff is not fortuitous, and Defendant is not liable here.

## IV. CONCLUSION

For the foregoing reasons, the Court will enter judgment for Defendant. The Court will also deny as moot Defendant's Motion to Exclude Expert Testimony.